**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICANDRO CRUZ, as an individual, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LUIS ANTONIO GONZALEZ DBA LATINO FARM LABOR SERVICE, an induvial; and DOES 1 through 100, inclusive,<br><br>Defendants. | No. 1:23-cv-00037-KES-SKO<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO REMAND**<br><br>Doc. 8 |

Plaintiff Nicandro Cruz, individually, and on behalf of similarly situated individuals, brings this putative class action complaint against defendant Luis Antonio Gonzalez dba Latino Farm Labor Service ("Gonzalez") alleging various state wage and hour violations. Cruz moves to remand this case to state court, and in the alternative, requests limited jurisdictional discovery. Doc. 8. For the reasons set forth below, Cruz's motion to remand and related request for limited jurisdictional discovery are denied.

**I.  PROCEDURAL BACKGROUND**

On November 1, 2022, Cruz, individually and on behalf of similarly situated individuals, filed a putative class action complaint against Gonzalez in the Superior Court of the State of California for the County of Tulare. Doc. 1-1, Ex. A, at 1–20 ("Compl."). The complaint alleges

1

eight causes of action: (1) Minimum Wage Violations (Cal. Lab. Code §§ 1182.12, 1994, 1194.2, and 1197); (2) Failure to Pay All Overtime Wages (Cal. Lab. Code §§ 204, 510, 558, 1194 and 1198); (3) Rest Period Violations (Cal. Lab. Code §§ 226.7, 516); (4) Waiting Time Penalties (Cal. Lab. Code §§ 201–203); (5) Wage Statement Violations (Cal. Lab. Code § 226 *et seq.*); (6) Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*); (7) Failure to Reimburse for Necessary Business Expenses (Cal. Lab. Code § 2802); and (8) Unlawful Deduction of Wages (Cal. Lab. Code § 221). *Id.* Cruz seeks to certify six classes based on the first, second, third, fourth, fifth, and seventh claims. *See id.* at 8–9.

On January 6, 2023, Gonzalez filed a notice of removal alleging that this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"). Doc. 1 (citing 28 U.S.C. § 1332(d)). In support of his notice of removal, Gonzalez filed a declaration. Doc. 1-2. On February 8, 2023, Cruz filed the present motion to remand the action to state court, challenging Gonzalez's contention that the $5,000,000 amount in controversy is met and asserting that the home state exception to CAFA applies.[1] Doc. 8. On February 22, 2023, Gonzalez opposed the motion. Doc. 10. In support of his opposition, Gonzalez filed another declaration. Doc. 10-1 (Feb. 22, 2023 Gonzalez Decl."). Cruz replied in support of his motion on March 3, 2023. Doc. 11.[2]

**II.    FACTUAL BACKGROUND**

Cruz alleges he began his employment with Gonzalez as a non-exempt employee around 2014 and, as relevant to the statute of limitations for several of the class claims, was employed by Gonzalez during the four years preceding the filing of the complaint. Compl. ¶¶ 3, 10. He alleges that he generally worked six days a week and worked at least eight hours per shift. *Id.* ¶ 10. He was generally scheduled to work from 6:30 a.m. until 2:30 p.m. but he and other non-exempt employees often worked considerably more hours. *Id.* However, Gonzalez did not pay

---

[1] Cruz originally moved to remand on February 1, 2023. Doc. 4. That motion was denied without prejudice on procedural grounds. Doc. 7.

[2] On March 14, 2024, this matter was reassigned from the No District Judge Docket to the undersigned. Despite the Court's diligent efforts, the Court recognizes that this case and other civil cases have unfortunately experienced unavoidable delays.

Cruz and others affected for those extra hours; Gonzalez instead "opt[ed] to compensate Cruz and other non-exempt employees based on their pre-scheduled hours." *Id.* Cruz also alleges that "[Cruz] and other non-exempt employees would be required to wait in lines to collect their wages" and were not compensated for the time spent in line and that they were required to report to the worksite each day, regardless of weather conditions, but were not paid for such reporting time when they were unable to work. *Id.* ¶ 11. "[Cruz] and other non-exempt employees" also "routinely worked overtime hours" for which Gonzalez failed to pay overtime wages. *Id.*

He also alleges that "[he] and other non-exempt employees" were "not authorized to take all legally required rest periods." *Id.* ¶ 12. Rather, they "rarely, if ever, were provided to exercise the use of rest periods and instead would be made to work through the entirety of their shifts (outside of the time they were allotted for meal periods)." *Id.* "[T]o the extent that rest periods were ever provided, Defendants did not provide [Cruz] and other non-exempt employees with any legally compliant rest periods free of employer control and in the shade of the sun during the entirety of [Cruz's] employment with Defendants." *Id.*

Cruz asserts that, as a result of Gonzalez's "failure to pay all minimum and overtime wages, and rest period premium wages, Defendants maintained inaccurate payroll records, and issued inaccurate and deficient wage statements." *Id.* ¶ 15. Cruz also contends that the wage statements were inadequate because they unlawfully omitted certain required information and unlawfully included other information, including the employees' social security numbers. *Id.* Also as a result of Gonzalez's "failure to pay all minimum and overtime wages, and rest period premium wages," Cruz alleges that Gonzalez "failed to pay all wages owed to [Cruz] and other non-exempt employees upon their separation of employment from Defendants." *Id.* ¶ 16.

Cruz further alleges that Gonzalez required them to purchase their own work-related tools but "failed to adequately reimburse [Cruz] and other non-exempt employees for all reasonable and necessary work expenditures." *Id.* ¶ 13. Finally, Cruz alleges that Gonzalez "maintain[ed] a policy and practice applicable to [Cruz] and the members of the [various] [c]lasses [Cruz seeks to certify] whereby [Gonzalez] deducted $7 from their wages on each occasion that they were paid in cash." *Id.* ¶¶ 14, 61.

3

### III.     LEGAL STANDARD

CAFA grants federal district courts original jurisdiction over class actions in which there are at least 100 class members, any plaintiff is diverse in citizenship from any defendant, and the amount in controversy exceeds $5 million, notwithstanding interest and costs.  28 U.S.C. § 1332(d); *see also Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1195 (9th Cir. 2015).  Congress intended CAFA to be interpreted expansively, and "[n]o antiremoval presumption attends cases invoking CAFA."  *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922, 924 (quoting *Dart Basin Operating Co. v. Owens,* 541 U.S. 81, 89 (2014)).

"The amount in controversy is not a prospective assessment of a defendant's liability," but rather "is the amount at stake in the underlying litigation."  *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018) (cleaned up).  "In determining the amount in controversy, courts first look to the complaint."  *Ibarra*, 775 F.3d at 1197 (quotations omitted).  When the complaint does not state the amount of damages, the defendant seeking removal bears the burden to show that the amount in controversy exceeds $5 million.  *Id.*

In its notice of removal, a defendant need only include "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart*, 541 U.S. at 89.  However, when "a defendant's assertion of the amount in controversy is challenged . . . both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied."  *Id.* at 88.  "The parties may submit evidence outside the complaint, including affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal."  *Ibarra*, 775 F.3d at 1197 (citation omitted).

A challenge to a defendant's assertion of the amount in controversy can be facial or factual.  *See Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020).  "A facial attack accepts the truth of the [defendant's] allegations but asserts that they are insufficient on their face to invoke federal jurisdiction," whereas a "factual attack contests the truth of the . . . allegations themselves."  *Id.* (internal citations and quotation marks omitted).  "When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that

4

the amount in controversy exceeds the $5 million jurisdictional threshold." *Id.* (citations omitted).

"A defendant may rely on reasonable assumptions to prove that it has met the statutory threshold." *Id.* at 701; *see also Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 993 (9th Cir. 2022). "[A]t [this] stage of the litigation, the defendant is being asked to use the plaintiff's complaint—much of which it presumably disagrees with—to estimate the amount in controversy" so the defendant "must be able to rely 'on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million,' as long as the reasoning and underlying assumptions are reasonable." *Jauregui*, 28 F.4th at 993 (quoting *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015)). The "burden of demonstrating the reasonableness of the assumptions on which the calculation of the amount in controversy [is] based remain[s] at all times with [the defendant]." *Harris*, 980 F.3d at 701. "An assumption may be reasonable if it is founded on the allegations of the complaint." *Arias*, 936 F.3d at 927. A defendant does not need to "provide evidence proving the assumptions correct" as this would be akin to "impos[ing] a requirement that [the defendant] prove it actually violated the law." *Id*. Rather, such assumptions "must only have 'some reasonable ground underlying them'" and "cannot be pulled from thin air." *Id.* at 925 (quoting *Ibarra*, 775 F.3d at 1199).

"The district court should weigh the reasonableness of the removing party's assumptions, not supply further assumptions of its own." *Id*. However, "there is an important distinction between a court offering entirely new or different assumptions itself versus modifying one or more assumptions in the removing party's analysis." *Jauregui*, 28 F.4th at 996. It remains true that "[w]here a defendant's assumption is unreasonable on its face without comparison to a better alternative, a district court may be justified in simply rejecting that assumption and concluding that the defendant failed to meet its burden." *Id.* at 996. However, where "the reason a defendant's assumption is rejected is because a different, better assumption is identified," the court "should consider the claim under the better assumption—not just zero-out the claim." *Id.* This is in part because "the amount in controversy is supposed to be an estimate of the entire

5

1   potential amount at stake in the litigation," which "demonstrates the unrealistic nature of
2   assigning $0" to a plaintiff's claims. *Id.* at 994.
3         Under certain circumstances, attorneys' fees may also be included in the amount in
4   controversy. "[I]f the law entitles the plaintiff to future attorneys' fees if the action succeeds,
5   then there is no question that future attorneys' fees are at stake in the litigation, and the defendant
6   may attempt to prove that future attorneys' fees should be included in the amount in controversy."
7   *Fritsch v. Swift Transp. Co. of Ariz.*, 899 F.3d 785, 794 (9th Cir. 2018) (internal quotations,
8   brackets, and citation omitted). However, "a court's calculation of future attorneys' fees is
9   limited by the applicable contractual or statutory requirements that allow fee-shifting in the first
10  place." *Id.* at 796.

### IV.  ANALYSIS

12        Cruz moves to remand this case on the grounds that the amount in controversy is not met
13  and that, in any event, the home state exception to CAFA applies. *See generally* Doc. 8. In his
14  opposition, Gonzalez contends that the motion to remand is untimely, that the amount in
15  controversy exceeds $5 million dollars, and that the home state exception does not apply. *See*
16  *generally* Docs. 10, 10-1. The parties do not dispute that the other CAFA requirements are met—
17  that is, that the number of potential class members exceeds 100 or that the required minimal
18  diversity between the parties exists. *See* Docs. 8, 10, 11.

#### A.     **Timeliness of Motion to Remand**

20        Gonzalez argues that the motion to remand is untimely because it was filed more than 30
21  days after the notice of removal was filed. *See* Doc. 10. "A motion to remand the case *on the*
22  *basis of any defect other than lack of subject matter jurisdiction* must be made within 30 days
23  after the filing of the notice of removal." 28 U.S.C. § 1447(c) (emphasis added). However, Cruz
24  does not allege that there is merely a procedural defect in the notice of removal. *See* Doc. 8.
25  Rather, Cruz moves to remand on the basis that this court lacks subject matter jurisdiction—
26  specifically, that the amount in controversy does not meet the $5 million jurisdictional threshold
27  required under CAFA and that CAFA's home state exception applies. Doc. 8 (citing 28 U.S.C.
28  § 1332(d)). Therefore, under 28 U.S.C. § 1447(c), Cruz's motion could have been brought at any

time during this suit. Thus, Cruz's motion to remand is timely.

### B. Amount in Controversy

Cruz first moves to remand on the grounds that the amount in controversy does not exceed the $5 million CAFA jurisdictional minimum. Doc. 8. Because the complaint does not state the amount of damages sought, and Cruz mounts a factual challenge to Gonzalez's asserted amount in controversy, the burden rests with Gonzalez to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million.[3] *See Ibarra*, 775 F.3d at 1197; *Harris*, 980 F.3d at 699.

To establish that more than $5 million is in controversy, Gonzalez permissibly relies on his February 22, 2023 declaration and the language of the complaint. *See generally* Doc. 10; *see also, e.g.*, *Enomoto v. Siemens Ind., Inc.*, No. 22-56062, 2023 WL 8908799, at *2 (9th Cir. 2023) ("A defendant is permitted to rely on a declaration from an individual who has reviewed relevant employee payroll and wage data to support its amount in controversy allegations.") (citations omitted); *Arias*, 936 F.3d at 927 ("An assumption may be reasonable if it is founded on the allegations of the complaint."). Specifically, in his declaration, Gonzalez stated that he began Latino Farm Labor Service in 2005, that he is involved in its day-to-day operations including the hiring, management and payment of the employees, and that he reviewed the employee records from 2018 through the date of the declaration to make the declaration. Feb. 22, 2023 Gonzalez Decl. ¶ 3. He further declared that Latino Farm Labor Service did not have any part time employees during the years of 2019, 2020, 2021, and 2022. *Id.* ¶¶ 4–7. He also stated that, though Latino Farm Labor Service provides farm labor services year-round, its "peak hiring and employment season" is from May 1 through October 31,[4] and that during that time, Latino Farm

---

[3] Cruz's challenge is factual, rather than facial, because, as described below, Cruz challenges the truth of Gonzalez's allegations regarding the number of members of each proposed class who suffered each of the alleged violations and the frequency of such alleged violations, not the "form" of Gonzalez's showing. *See Harris*, 980 F.3d at 699–700.

[4] Though Gonzalez uses 24 weeks in his amount in controversy calculations for this period, *see, e.g.*, Doc. 10-1 at 6, by the Court's count, there are 26 weeks and 1 day between May 1 and October 31. Thus, the Court uses 26 weeks in its calculations regarding the amount in controversy. *See Jauregui*, 28 F.4th at 996 (where "a defendant's assumption is rejected is

Labor Services has "more than 500 workers working full time," which consists of working five or six days per week and eight hours per day. *Id.* ¶ 8. And Gonzalez purports to use the language of the complaint to make assumptions regarding how many of the members of each class suffered each violation or how frequently the alleged violations occurred. *See* Docs. 10, 10-1.

Cruz asserts that Gonzalez's assumptions—namely that each of the 500 potential employees employed during the "peak season" suffered each of the alleged violations and the assumed rates of violation for each claim—are unreasonable, and that Gonzalez has therefore not met his burden to show the amount in controversy for any of the claims. *See* Docs. 8, 11. The Court need not opine on the reasonableness of each of Gonzalez's assumptions and calculations for each of the claims, because Gonzalez has shown the amount in controversy exceeds $5 million through the alleged rest break and wage statement violations and related attorneys' fees alone.

For the rest period violations claim, Gonzalez assumed each of the (at least) 500 employees during the peak season from May 1 to October 31 was not provided two rest periods per day, five days per week, for the four-year statute of limitations for the claim.[5] Doc. 10-1 at 6. Therefore, Gonzalez multiplied 500 employees by 24 weeks[6] by 5 days per week by 2 missed rest periods per day by $14 per hour ("minimum wage") by 4 years[7] to equal $6,720,000. *Id.* In his

---

because a different, better assumption is identified," the court "should consider the claim under the better assumption").

[5] Gonzalez explains that, although the Cruz's claims span the entirety of the period of the four years at issue and although employees frequently worked 6 days per week, he conservatively used only the peak season period and 5 working days per week in his calculations establishing the amount in controversy is met. *See generally* Docs. 10, 10-1.

[6] Gonzalez uses 24 weeks to represent the peak period from May 1 to October 31, but as noted above, *see supra* n.4, there are 26 weeks in that period.

[7] Though neither party addresses it in the briefing, it was reasonable to calculate the amount in controversy for rest period violations for the four years prior to the filing of this lawsuit, because even though rest period claims pursuant to the California Labor Code are subject to a three-year statute of limitations, the UCL's four-year statute of limitations allows a plaintiff to obtain an additional year's worth of such wages as restitution. *See, e.g.*, *Byrd v. Masonite Corp.*, Case No. EDCV 16-35 JBG (KKx), 2016 WL 2593912, at *4 n.6 (C.D. Cal. May 5, 2016) (explaining the same).

8

1   motion to remand and in his reply, Cruz asserts it was unreasonable to assume that *all* 500
2   employees were denied *two* rest periods per day.  Docs. 8, 11 (emphases added).  However, as
3   discussed below, both assumptions were reasonable.
4       Cruz alleges that "[Gonzalez] failed to authorize and permit [Cruz] and members of the
5   Rest Period Class to take all legally complaint rest periods" creating "an entitlement to recovery
6   by [Cruz] and members of the Rest Period Class."  Compl. ¶¶ 38–39.  Cruz defined the "[t]he
7   Rest Period Class [to] consist[] of *all* current and former non-exempt employees of Defendants in
8   California . . . who worked at least one shift in excess of 3.5 hours during the four years
9   immediately preceding the filing of this lawsuit through the present."  Compl. ¶ 18(c) (emphasis
10  added).  Given that Gonzalez attested in his declaration that he did not employ any part time
11  employees and that all employees worked eight-hour shifts (and therefore all employees during
12  the 26-week peak season worked shifts in excess of 3.5 hours), the rest period class definition, in
13  conjunction with the Gonzalez declaration, supports the assumption that all employees during the
14  26-week peak season are part of the rest period class, and are thus alleged to have suffered a rest
15  period violation.  *See Beltran v. PeopleReady, Inc.*, 3:23-cv-00179-WHO, 2023 WL 3092973, at
16  *6 (N.D. Cal. Apr. 25, 2023) (finding "inclusion of *all* non-exempt employees in definition of
17  class" supported defendant's assumption that defendant theoretically could be liable for injuries
18  to *all* non-exempt employees in that class); *see also, e.g.*, *Gen. Tel. Co. of the Sw. v. Falcon*, 457
19  U.S. 147, 156 (1982) (while the typicality requirement for class certification does not require a
20  class representative's claim to be exactly the same in scope or damages as other class members, it
21  does require that he or she has suffered the same injury).  It was therefore reasonable for
22  Gonzalez to assume that *all* employees during the peak seasons suffered at least one rest period
23  violation during the relevant years.
24      Further, based on the allegations in the complaint, it was reasonable to assume that each
25  person who suffered at least one rest period violation (which, as noted above, includes all
26  employees working during the 26-week peak seasons) suffered two rest period violations per day.
27  Cruz's complaint alleges that "[Cruz] and other non-exempt employees rarely, if ever, were
28  provided to exercise [sic] the use of rest periods and instead would be made to work through the

entirety of their shifts." Compl. ¶ 12. The complaint further alleges that "to the extent that rest periods were ever provided, Defendants did not provide [Cruz] and other non-exempt employees with *any* legally compliant rest periods free of employer control" during the relevant years. *See id.* at ¶¶ 3, 12 (emphasis added). Thus, Cruz's allegations support the assumption that Gonzalez did not provide *any* lawful rest periods to any employee who worked during the relevant 26-week peak seasons. And, based on Gonzalez's declaration and the governing provisions, those employees would have been entitled to at least two rest periods per day. As noted, Gonzalez's declaration states that all employees worked eight hours per day. Pursuant to Wage Order No. 14–2001, employers are required to permit employees to take a 10-minute rest period every four hours of work or "major fraction thereof." 8 Cal. Code Regs. § 11140(12). "California courts have held that this provision means that one 10-minute rest period is required for shifts between three and one-half and six hours in length, two 10-minute rest periods are required for shifts between six and ten hours, and three 10-minute rest periods between ten and fourteen hours." *See, e.g.*, *Garybo v. Leonardo Bros.*, No. 1:15-cv-01487-DAD-JLT, 2019 WL 2325564, at *4 (E.D. Cal. May 31, 2019) (citations omitted). Thus, because Cruz alleged that no lawful rest periods were ever provided to any class member and the class members worked at least 8 hours per shift, it was also reasonable for Gonzalez to assume that each of them would have been entitled to at least two 10-minute rest periods per shift.

However, courts have interpreted section 226.7(c) to provide that regardless of how many rest period violations occur in a single work day, only one hour of wages may be recovered per workday. *See* Cal. Lab. Code § 226.7(c) ("If an employer fails to provide an employee a meal or rest or recovery period . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation *for each workday* that the meal or rest or recovery period is not provided.") (emphasis added); *see also, e.g.*, *Marlo v. United Parcel Service, Inc.*, No. CV 03-04336 DDP (RZx), 2009 WL 1258491, at *7 (C.D. Cal. May 5, 2009) ("[I]f more than one rest period violation occurs in a single work day but no meal period violations occur, [an employee] may only recover one additional hour of pay for all of the rest period violations combined."). Thus, the Court will assume that class members are entitled to one hour of pay per

10

workday for the alleged rest break violations, rather than two hours of pay per workday. *See Jauregui*, 28 F.4th at 996 (where "the reason a defendant's assumption is rejected is because a different, better assumption is identified," the court "should consider the claim under the better assumption—not just zero-out the claim").

Additionally, Gonzalez's use of $14 per hour as the penalty wage for calculating the amount in controversy for this claim is unsupported. Without citation, he asserts $14 was the "minimum wage," *see* Doc. 10-1 at 5–6, but it appears that the minimum wage was not $14 for all four years at issue. State of California Department of Industrial Relations, Minimum Wage Frequently Asked Questions, What is the minimum wage in California?, https://www.dir.ca.gov/dlse/faq_minimumwage.htm (last visited Aug. 14, 2025).[8] Rather, minimum wage in California was $12 per hour in 2019, $13 in 2020, $14 in 2021, and $15 in 2022. *Id*. Thus, the Court will apply the applicable minimum wage at issue for each year to calculate the amount in controversy.[9]

Therefore, the minimum amount in controversy for the rest period claim is as follows:[10]

---

[8] The Court takes judicial notice of the State of California Department of Industrial Relations information page, located at https://www.dir.ca.gov/dlse/faq_minimumwage.htm, concerning the rate of California's minimum wage for the relevant years. This information is properly the subject of judicial notice as it "was retrieved from a State of California official website and is therefore a matter of public record not subject to reasonable dispute." *See, e.g.*, *Lopez v. West Coast Arborists, Inc.*, No. 2:23-cv-02734 WBS DB, 2024 WL 382368, at *2 (E.D. Cal. Feb. 1, 2024) (taking judicial notice of the same).

[9] The penalty for failing to provide a rest period is "one additional hour of pay at the employee's regular rate of compensation." Cal. Lab. Code § 226.7(c). However, no evidence of the employees' rate of compensation has been put forth; therefore, it is reasonable to use the minimum wage, as the minimum amount the penalty could be is the minimum wage.

[10] The Court notes that this is the minimum amount that could be in controversy given that these calculations assume 500 employees, 5 days of work per week, and 26 weeks per year, when, in reality, there were more than 500 employed workers during the relevant time periods, many of the employees worked 6 days per week rather than 5, and the claims cover the entirety of each year, not only 26 weeks per year.

| Year | Calculation | Total |
|---|---|---|
| 2019 | 500 (employees) x 26 (weeks) x 5 (days/week) x $12 (minimum wage) | $780,000 |
| 2020 | 500 (employees) x 26 (weeks) x 5 (days/week) x $13 (minimum wage) | $845,000 |
| 2021 | 500 (employees) x 26 (weeks) x 5 (days/week) x $14 (minimum wage) | $910,000 |
| 2022 | 500 (employees) x 26 (weeks) x 5 (days/week) x $15 (minimum wage) | $975,000 |
| | **Total:** | **$3,510,000** |

Therefore, it is more likely than not that at least $3,510,000 is in controversy for Cruz's rest period violations claim.

Given the above and given that Cruz's wage statements claim is based, in part, on the alleged failure to provide rest periods, it was also reasonable for Gonzalez to assume that each of the 500 peak employees was not furnished an accurate wage statement during each week of the peak period for the one-year period within the statute of limitations for this claim. Doc. 10-1 at 7; *see also Naranjo v. Spectrum Security Servs., Inc.*, 13 Cal. 5th 93, 117– (2022) (holding failure to pay break premium wages under section 226.7 can form the basis for a wage statement claim under section 226). However, it was not reasonable for Gonzalez to assume that the violation penalty would be $100 for each week when section 226(e)(1) provides that the penalty for an initial violation is $50 and the penalty for any subsequent violations is $100. Therefore, the Court modifies Gonzalez's assumption for the first week of the peak period and calculates the amount in controversy for this claim as follows:

| Calculation | Total |
|---|---|
| 500 (employees) x 1 (week) x $50 (first violation penalty) | $25,000 |
| 500 (employees) x 25 (weeks) x $100 (subsequent violation penalty) | $1,250,000 |
| **Total:** | **$1,275,000** |

Therefore, it is more likely than not that at least $1,275,000 is in controversy for Cruz's wage statement violations claim.

Finally, Gonzalez argues that the Court should calculate the amount in controversy for the attorneys' fees as 25% of the total amount in controversy. *See* Doc. 10-1 at 8. In his motion to remand, Cruz argues that Gonzalez has presented no evidence that a 25% attorneys' fee award would be reasonable in this case. Doc. 17 at 22. Cruz appears to abandon this argument in his reply, arguing only that Cruz will not be able to recover attorneys' fees for each of his claims, which necessarily affects the amount in controversy for attorneys' fees. Doc. 11 at 9.

As noted above, "if the law entitles the plaintiff to future attorneys' fees if the action succeeds, then there is no question that future attorneys' fees are at stake in the litigation, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy." *Fritsch*, 899 F.3d at 794 (internal quotations, brackets, and citation omitted). But "a court's calculation of future attorneys' fees is limited by the applicable contractual or statutory requirements that allow fee-shifting in the first place." *Id.* at 796.

The California Labor Code entitles a prevailing plaintiff to attorneys' fees for wage statement violations. *See* Cal. Lab. Code § 226(e)(1). However, it does not entitle a prevailing plaintiff to attorneys' fees for rest period violations. *See Kirby v. Immoos Fire Protection, Inc.*, 53 Cal. 4th 1244, 1248 (2012); *see also Naranjo*, 13 Cal. 5th at 110–12 (confirming *Kirby*'s holding remains good law). Nor does Cruz appear to seek attorneys' fees for his rest period claims brought pursuant to the California Labor Code. *See* Compl. ¶ 36 & Prayer for Relief ¶ 13. However, as noted above, one year of Cruz's claims regarding rest period violations appears to be

13

brought pursuant to the UCL, rather than the California Labor Code, given the California Labor Code's three-year statute of limitations for such claims. *See supra* n.7. Though the UCL also does not provide for attorneys' fees, "and relief is generally limited to injunctive relief and restitution," under certain circumstances, "[i]f a plaintiff prevails in an unfair competition law claim, it may seek attorney fees as a private attorney general pursuant to Code of Civil Procedure section 1021.5." *Walker v. Countrywide Home Loans, Inc.*, 121 Cal. Rptr. 2d 79, 94 (Cal. Ct. App. 2002). Here, Cruz has put attorneys' fees for his UCL claim premised on rest violations at stake in the litigation, as he alleges in his complaint that he is entitled to recover attorneys' fees for the claim pursuant to section 1021.5. Compl. ¶¶ 48, 53.

The total amount in controversy for Cruz's rest period and wage statement violations is $4,785,000. Thus, the attorneys' fees in controversy must only be greater than $215,000 for the total amount in controversy to exceed CAFA's $5 million jurisdictional requirement. The amount in controversy for the claims for which Cruz may seek attorneys' fees—that is, the wage statement claim and the rest period claim for the one year (2019) that is brought pursuant to the UCL—is $2,055,000. And $215,000 is about 10.5% of $2,055,000.

It is reasonable, and likely conservative, to assume that attorneys' fees will exceed 10.5% of Cruz's potential recovery. *See also, e.g.*, *Bartholomew v. Goodman Mfg. Co.*, No. 2:22-cv-00027-TLN-AC, 2022 WL 4355147, at *8 (E.D. Cal. Sept. 20, 2022) (finding it reasonable to assume attorneys' fees will exceed 11% in a putative wage and hour class action). This is especially true given that this figure does not reflect the potential recovery for Cruz's minimum wage and overtime wage claims, for which Cruz also seeks attorneys' fees. Compl. ¶¶ 30, 35.

Thus, between Cruz's rest period claim, wage statement claim, and available attorneys' fees related to those claims, without consideration of Cruz's other claims, it is more likely than not that the amount in controversy exceeds $5 million, satisfying CAFA's jurisdictional requirement.

C.   **CAFA's Home State Exceptions**

CAFA provides for two exceptions to federal courts exercising jurisdiction over class actions that otherwise meet the jurisdictional CAFA requirements, which are often "[s]omewhat

14

perplexingly" both referred to as either the home state exception, *Adams v. W. Marine Prods., Inc.*, 958 F.3d 1216, 1221 (9th Cir. 2020), or the local controversy exception, *see, e.g.*, *Mondragon v. Capital One Auto Finance*, 736 F.3d 880, 882 (9th Cir. 2013).  The first home state exception to exercising jurisdiction is mandatory and the second is discretionary.  *Id.*  As for the mandatory home state exception, CAFA provides that the district court "*shall* decline to exercise jurisdiction" over a class action in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."  28 U.S.C. § 1332(d)(4)(B) (emphasis added).  As for the discretionary home state exception, CAFA provides that a district court "*may*, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction" when more than one-third of the putative class, and the primary defendants, are citizens of the state where the action was originally filed.  *Id.* § 1332(d)(3) (emphasis added).  The purpose of these exceptions is to allow "truly intrastate class actions to be heard in state court."  *Adams*, 958 F.3d at 1220.

Once CAFA jurisdiction has otherwise been established, the party seeking remand has the burden to show that an exception to CAFA jurisdiction applies.  *Id.* at 1221.  As Gonzalez has met his burden to demonstrate that the amount in controversy is met, Cruz has the burden to show that one of the home state exceptions apply.  The parties do not dispute that Gonzalez, the primary defendant, is a citizen of the state in which the action was originally filed—California.  Therefore, the only dispute is whether two-thirds or more of the proposed classes (or between one-third and two-thirds of the proposed classes) are also California citizens.[11]

To demonstrate citizenship of a state of the United States for diversity purposes, a party

---

[11] In line with other courts in this circuit, the Court rejects Gonzalez's contention that the Court should not consider Cruz's argument that the home state exception applies because of Cruz's failure to set forth such argument in his notice of motion.  *See, e.g.*, *Athena Cosmetics, Inc. v. AMN Distribution Inc.*, Case No. 2:20-cv-05526-SVW-SHK, 2022 WL 4596549, at *2 n.2 (C.D. Cal. Aug. 16, 2022) (finding, in context of a motion for summary judgment, that Rules 7 and 56 impose requirements on a motion, not on the notice of motion, so the contention was "wholly without merit").  Where the motion itself clearly sets forth the argument and the basis supporting it, as here, there is no violation of Federal Rules of Civil Procedure 7 or 8.  *Cf. Athena Cosmetics*, 2022 WL 4596549, at *2 n.2.

15

must be (1) a citizen of the United States, and (2) domiciled in that state. *See, e.g.*, *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) (citations omitted). "A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return." *Id.* Thus, "[a] person residing in a given state is not necessarily domiciled there, and thus is not necessarily a citizen of that state." *Id.* However, "at minimum, a person's residence constitutes *some* evidence of domicile." *Adams v. West Marine Products, Inc.*, 958 F.3d 1216, 1221 (9th Cir. 2020) (emphasis in original) (citing *Mondragon v. Capital One Auto Finance*, 736 F.3d 880, 886 (9th Cir. 2013)).[12]

When a party points to residency to help establish citizenship, the district court "should consider 'the entire record' to determine whether evidence of residency can properly establish citizenship." *Mondragon v. Capital One Auto Finance*, 736 F.3d at 886 (citation omitted). The district court then "makes factual findings regarding jurisdiction under a preponderance of the evidence standard." *Id.* at 884.

To attempt to meet his burden, Cruz first contends that "it is more likely than not that more than two-thirds of the putative class are citizens of California" given that, by his class definitions, Cruz "only seeks to represent classes of non-exempt employees who worked in California." Doc. 8 at 18. However, where the defendant challenges that two-thirds or more of the class members are state citizens, as here, allegations in the complaint are typically insufficient; rather, the plaintiff must put forth evidence of the members' citizenships to carry its burden. *See Mondragon*, 736 F.3d at 883–885 (noting exception to this rule where complaint

---

[12] There is some uncertainty as to whether the Ninth Circuit has adopted the presumption that a person's residency is prima facie evidence of that person's domicile until proven otherwise. *See Mondragon*, 736 F.3d at 886 (9th Cir. 2013) (noting that Ninth Circuit has not adopted the presumption that a person's residency is that person's domicile until proven otherwise); *Ehrman v. Cox Commc'ns, Inc.*, 932 F.3d 1223, 1228 (9th Cir. 2019) (suggesting the same); *Adams*, 958 F.3d at 1221 (suggesting the same); *but see New Gen, LLC v. Safe Cig, LLC*, 840 F.3d 606 (9th Cir. 2016) (noting "[i]t is a longstanding principle that '[t]he place where a person lives is taken to be his domicile until facts adduced establish the contrary'"). Because Gonzalez has put forth evidence to rebut Cruz's citizenship claims based on residency, this potential split does not affect the outcome of this Order.

16

1  defines class to include only citizens of state).[13]

2  As evidence, Cruz submitted his own declaration, signed under penalty of perjury, attesting that "[b]ased on different conversations [he] had with other farm laborers on [his] crew, [he was] aware that almost all of [the other farm laborers on his crew] live year-round in California," though they "occasionally vacation in Mexico for a couple weeks a year." Doc. 8-2 ¶ 4. Cruz further attested that he "was not aware of any other farm laborers [who] worked for Defendant who lived outside of the United States and who were working for Defendant in California on a work visa." *Id.* ¶ 5. In response, Gonzalez attested under penalty of perjury in his February 22, 2023 declaration that, based on his review of the hiring records of his employees, more than 70% of his employees in 2019, 2020, 2021, and 2022 were not citizens of the United States (and therefore not California citizens) but were otherwise authorized to work in the United States. Doc. 10 at 12; *see also* Doc. 10-1 ¶ 4–7.

Cruz put forward evidence in the form of his own sworn declaration that he was aware that almost all the members of his crew live year-round in California and that he was not aware of any employees who were working for Gonzalez on a work visa. However, when considering the entire record, including Gonzalez's sworn declaration based on a review of the employees' records, Cruz's evidence fails to carry his burden to prove by a preponderance of the evidence that two-thirds or more of the employees are California citizens. Rather, it appears more likely than not that more than two-thirds of the members of the class are not California citizens. Thus, Cruz has failed to demonstrate that the home state exception applies. Cruz's motion to remand is therefore denied.

In his motion, Cruz requests that, if the Court does not find his evidence sufficient to demonstrate the applicability of the home state exception, he be permitted to conduct limited

---

[13] Cruz also protests that Gonzalez "only identified two putative class members potentially domiciled outside of California." *Id.* However, this misstates the parties' relative burdens: the burden is not on Gonzalez to show that members of the classes are not California citizens. It is on Cruz to show that two-thirds of the members of the classes are California citizens. Even so, Gonzalez did set forth evidence. As noted, he attested that more than 70% of the potential members of the classes were not citizens of the United States and therefore not citizens of California.

17

1  jurisdictional discovery to ascertain the citizenship of the members of the classes.  *See* Doc. 8
2  at 20; Doc. 11 at 10.  "Discovery may be appropriately granted where pertinent facts bearing on
3  the question of jurisdiction are controverted or where a more satisfactory showing of the facts is
4  necessary."  *See, e.g.*, *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (citation
5  omitted).  Neither circumstance is present here.

6        The pertinent facts bearing on the question of jurisdiction concern the citizenship of the
7  members of the proposed classes, which is not realistically controverted.  Though Cruz disputes
8  that more than 70% of the class are non-citizens, he does not set forth any argument that creates a
9  genuine dispute of this fact given the sworn declaration of Gonzalez.  Cruz merely states that
10 "with a class this large, it is more likely than not that limited discovery will prove California
11 citizenship."  Doc. 11 at 10.  However, the size of the class does not necessarily provide any
12 indication of how many class members within that class will have a certain citizenship.
13 Additionally, Cruz's sworn declaration that he "was not aware" of any person having a work visa
14 does not create a genuine controversy regarding the citizenship status of the members of the class
15 as a whole.  *Id.* ¶ 5.

16       Nor has Cruz demonstrated that further discovery to necessary to satisfactorily establish
17 the relevant facts.  Gonzalez's sworn statement is that, based on his review of employment
18 records, more than 70% of the employees during the relevant time periods were not United States
19 citizens.  Cruz argues that this statement is insufficient because Gonzalez does not sufficiently
20 specify which employment records he reviewed and does not provide the reviewed records as
21 evidence.  Doc. 11 at 10.  However, Gonzalez has sworn under penalty of perjury that he is
22 involved in Latino Farm Labor Service's day-to-day operations, including the hiring,
23 management, and payment of employees and, on that basis, has personal knowledge of the hiring,
24 management, and payment of employees for the relevant years; that he personally reviewed the
25 employee records for the relevant years; and that based on that review, 70% of the employees are
26 not United States citizens.  Doc. 10-1 ¶ 3.  That is sufficient.  Cruz does not provide any basis to
27 discredit this sworn testimony, nor does he explain how discovery of the specific documents
28 Gonzalez reviewed would be likely to change the factual conclusions concerning the employees'

citizenship. *See Tercero v. Sacramento Logistics LLC*, 2024 WL 4884268, at *5 (E.D. Cal. Nov. 25, 2024) ("[L]imited jurisdictional discovery should not be permitted to conduct a 'fishing expedition.'").

## IV.   CONCLUSION AND ORDER

Based upon the foregoing, Cruz's motion to remand and his related request for jurisdictional discovery, Doc. 8, are denied.

IT IS SO ORDERED.

Dated:   September 10, 2025

UNITED STATES DISTRICT JUDGE